[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE MOTION TO SUPPRESS STATEMENTS (No. 43)
The principal question presented by the motion to suppress now before the court is whether the requirements of Edwards v. Arizona, 451 U.S. 477
(1981), have been satisfied in this case.
I. THE FACTS.
The case has a lengthy history, much of it recited in previous decisions. The homicide in question occurred on July 16, 1973. In 1997, police suspicion began to focus on Edward R. Grant. On September 3 and 4, 1997, Inspectors John Torento and Gerald Hanahan of the Chief State's Attorney's Office spoke with Grant at his place of business. (Grant does not seek to suppress his 1997 statements.) The officers requested that Grant consensually submit a sample of his blood for DNA testing. Grant CT Page 1459 initially agreed to do so. On September 5, 1997, however, Grant called Hanahan, saying that his attorney, William St. John, had advised him not to submit a blood sample. Later that day, Attorney St. John left a voicemail message with the office of John Massameno, an assistant state's attorney working on the investigation. That voicemail states that Attorney St. John is "getting back on that inquiry about Edward Grant." It further states that:
 He's kind of terrified about getting involved in this any further. . . . [H]e's told me that he doesn't want to voluntarily do anything at this point. And, you know, if you do want to take any further action, would you let me know so I — I'd like an opportunity to try to contest anything you want to do. . . .
 So just let me know if you want to schedule something at some point, some kind of hearing, let me know and I'll be — I'll make sure that I bring him with me. Thanks. If you need anything else, I'm at (203) 757-0311.
On September 18, 1997, Hanahan submitted a search warrant application for a sample of Grant's blood. The warrant was signed by the court (Spada, J.) on the same day and executed on the next. Attorney St. John's call is summarized in the search warrant application.
The events forming the basis of the motion now before the court occurred almost two years later, on June 24, 1999. On that day, Grant was arrested pursuant to an arrest warrant at his home, taken by automobile to the State Police Barracks in Bethany, where he was booked, and later driven to the Union Avenue detention facility in New Haven. The events of that day have been the subject of a lengthy evidentiary hearing before this court. The objective facts are not the subject of any real dispute. (The witnesses were credible law enforcement officers who told pretty much the same story; Grant did not testify.) The dispute between the parties concerns the legal conclusions to be drawn from the facts.
The events of June 24, 1999 must now be described. It will be helpful to separately describe the events occurring (1) at Grant's house, (2) in the first car ride to Bethany, (3) at the Bethany Barracks, and (4) in the second car ride to New Haven.
(1) The House.
The arrest warrant was served on Grant at his Waterbury residence at CT Page 1460 6:02 P.M. by Inspectors James Rovella and Peter Fearon of the Chief State's Attorney's Office. Two Waterbury police officers were also present as were some reporters from the media. Inspectors Rovella and Fearon were familiar with the 1997 search warrant application and knew or should have known that Grant had considered Attorney St. John to be his attorney in the matter of the Serra homicide at the time of that earlier warrant. No law enforcement officer called St. John about Grant's anticipated arrest.
Grant was working on a car outside his house. Rovella approached Grant, identified himself as a police officer, and told him that he had a warrant for Grant's arrest for the murder of Concetta Serra. Grant stood up and stated, "I told you people I didn't know that girl." Grant then hugged a woman (it is unclear if she was a girlfriend or a spouse) and told her to "call the lawyer." Fearon gave the woman his card to enable her or "the lawyer" to contact him. Grant was then handcuffed behind his back and placed in the police car.
This was Grant's third experience in being arrested. He had been arrested for misdemeanors on two previous occasions.
(2) The First Car Ride.
Grant was placed in the back of an unmarked police car and driven to the Bethany Barracks. Fearon drove, and Rovella sat with Grant in the back seat. The ride took approximately twenty to thirty minutes.
At the commencement of the ride, Rovella orally informed Grant of hisMiranda rights; Miranda v. Arizona, 384 U.S. 436 (1966); reading from a card. Rovella asked Grant if he understood his rights, and Grant stated that he did. Rovella then told Grant that it was his choice to speak to the officers and be interviewed without the presence of an attorney. Grant stated that his wife, or girlfriend, was calling an attorney and said, "Maybe I should wait."
Rovella did not ask further questions during the first car ride. Grant, however, spoke up on his own and said he thought the matter was all over the last time he spoke to investigators. He stated that he knew his fingerprint was found in the car that the "girl" was using the day she died because the previous investigators had told him that. He said that he had no idea how his fingerprints could possibly have been in the car. Rovella then told Grant that beside his fingerprints his blood was found in the victim's car and outside the car in the garage.
(3) The Barracks. CT Page 1461
Grant arrived at the Bethany Barracks at approximately 6:40 P.M. He was brought into the booking area, and his handcuffs were removed. Fearon presented Grant with a written notice of his Miranda rights. Grant read the form and initialed the various rights, indicating that he understood them. The form does not contain an express waiver provision, and Grant was not expressly asked to waive his rights. Fearon proceeded to book and fingerprint Grant.
Rovella asked Grant if he wished to be interviewed without the presence of an attorney. Grant replied that he wanted to talk to the officers but wanted first to speak to an attorney. Rovella asked if he had an attorney in mind, and Grant stated that his girlfriend would find the one he used last time.
Grant was seated across from Rovella at a desk in the booking room. Grant looked up at Rovella and stated, "Did you read about the guy in Texas that killed all those people? They got him on a fingerprint too." Rovella replied that he had read about the Texas case. Grant then said, without being questioned, "I couldn't begin to tell you where I was when she was murdered or even who I was with:" He went on to state that he used to do business in New Haven as an auto adjuster and at an auto paint store when he worked on cars at his family's auto body shop in Waterbury. He stated several times that he didn't even know her name. He stated that he was injured in the Army and had plates in his head. He added that he went to the Veteran's Hospital in West Haven. He stated that he used to find himself just driving around and not knowing how he got there. He said, "I just had blackouts and wouldn't remember. I really don't know." Rovella nodded his head during the soliloquy just described, but did not ask questions.
At this point, Rovella asked Grant if he wanted to talk about the matter. Grant replied that he didn't mind talking about it. Rovella then began to interrogate Grant.
Grant stated, in response to Rovella's questions, that during 1973 he often went to New Haven from where he lived in Waterbury. He worked as an auto adjuster for an insurance company and did auto body and engine work at his family's business in Waterbury. He was injured in the Army before 1973 and had several operations in which metal plates were put in his head. He attended appointments at the Veterans' Hospital in West Haven. He had blackouts and would often "wake up and not know how I got there or what I did in between." The blackouts were the result of the Army injury. When asked how he could explain his fingerprints in the victim's car, he shrugged his shoulders, turned his palms upwards, and said, "I don't know." Asked if he knew Penny Serra, he stated, "I don't remember her. I might have met her." Asked to explain the blood found in the car CT Page 1462 and garage, he stated, "I don't know. I'm not saying it isn't mine. I just don't remember."
Grant asked Rovella if the car had been damaged in an accident. Rovella replied that the car was only one year old. Grant stated that he often got cut when he did his auto adjusting because the accident left sharp or jagged edges. He pointed out his right wrist, which had a scar. He stated that he got that from working on a car and had to have an operation on the wrist. He didn't recall where the operation took place.
Rovella asked Grant if his recollection would be any better if they went to the Temple Street garage and walked around. Grant replied that he didn't even know where the garage was or recall being in the garage at any time but that he would agree to go with the officers.
It was now approximately 7:35 P.M. At this point, the interrogation was suddenly interrupted. Attorney St. John, deus ex machina, called Fearon and asked to speak to Grant. Grant spoke to St. John and told Rovella that his lawyer had advised him not to speak any further with the officers about the incident and not to accompany the lawyers to the Temple Street garage. He said, "I'd better do what he says. Nothing against you guys."
Grant gave no further statements in the Bethany Barracks.
(4) The Second Car Ride.
At approximately 7:47 P.M., Grant was placed in the rear seat of an unmarked police car to be driven to the Union Avenue detention facility. (There is some confusion in the record as to whether Grant was driven to Union Avenue or to the Community Correctional Center on Whalley Avenue, but the difference is unimportant for present purposes.) This time, he was handcuffed in the front rather than behind his back. Rovella and Fearon were in the car.
The officers did not interrogate Grant during the second car ride. At some point during the ride, Grant stated, "I don't remember what happened, but you guys probably don't believe me."
II. PROCEDURAL HISTORY.
On June 24, 1999, Grant was arrested pursuant to a warrant for the crime of murder. The case is presently awaiting trial. On November 15, 2001, Grant filed the Motion To Suppress Statements now before the court. The motion was the subject of an evidentiary hearing conducted (along with other court business) from January 11-23, 2002. It was argued CT Page 1463 on February 4, 2002.
Grant's brief and argument narrow the focus of his motion. He does not contest the admissibility of any statements made prior to June 24, 1999. He also does not contest the admissibility of the statement he made at the house. He contests the admissibility of all statements made in the two car rides and at the Bethany Barracks.
III. DISCUSSION.
(1) Overview.
Edwards v. Arizona, supra, holds that:
 [A]lthough . . . after initially being advised of his Miranda rights, the accused may himself validly waive his rights and respond to interrogation additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.
451 U.S. at 484-85. (Citations and footnote omitted.)
The court's task is to apply these principles to the facts at hand. The State concedes that Grant was in custody when he made the statements now under attack. The principal questions to be addressed are (1) was there "interrogation"? (2) did "the accused ask for counsel"? and (3) assuming that at some point the accused did ask for counsel, did he subsequently "initiate further communication, exchanges, or conversations with the police"? It will be helpful to address these questions in the context of the specific statements contested by Grant.
(2) The First Car Ride.
Grant was given his Miranda rights at the commencement of the first car CT Page 1464 ride. He understood those rights. When told that it was his choice to speak to the officers and be interviewed without the presence of an attorney, he stated that his wife, or girlfriend, was calling. an attorney and said, "Maybe I should wait." Was this an invocation of the right to counsel?
The Supreme Court has held that a defendant's statement to law enforcement officers that "Maybe I should talk to a lawyer" is "not a request for counsel." Davis v. United States, 512 U.S. 452, 462 (1994). "The use of the word `[m]aybe' by the defendant in Davis connotes uncertainty." State v. Jackson, 497 S.E.2d 409, 412 (N.C.), cert.denied, 525 U.S. 943 (1998). The same is true of the use of the word "[m]aybe" by Grant here. Grant's statement that "Maybe I should wait" was not an invocation of the right to counsel.
Although Grant was, of course, in custody, no questioning occurred during the first car ride. His statements to the police were entirely voluntary, made after he had been fully informed of his Miranda rights, and initiated by him. In spite of the fact that no questioning occurred, however, Grant maintains that the words spoken by Rovella constituted "interrogation" for constitutional purposes. His arguments focus on two sets of statements: (a) Rovella's Miranda warnings and their follow-up, and (b) Rovella's remark concerning the blood found in the car.
Grant's argument on the Miranda warnings is this. Miranda warnings need only be given prior to interrogation. The police could not, however, interrogate Grant because he already had a lawyer (St. John) in this very case, and the police knew it. The only purpose of a Miranda warning in this setting, according to Grant, would be to somehow convey the message that his rights were somehow in doubt. This argument is deeply unpersuasive,
Under our law, Miranda warnings cannot be considered "interrogation." Such a ruling would transform the law of criminal procedure. "Miranda has become embedded in routine police practice to the point where the warnings have become part of our national culture." Dickerson v. UnitedStates, 530 U.S. 428, 443 (2000). It would have been a dereliction of duty for the police not to give Grant his Miranda warnings.
Rovella's attempt to clarify Grant's ambiguous statement concerning his attorney was also appropriate under our law. While such clarification is not required under our law in the wake of a suspect's ambiguous remark concerning counsel, it is unquestionably permitted. State v. Hafford,252 Conn. 274, 292, 746 A.2d 150, cert. denied, 531 U.S. 855 (2000). Although the police knew that Grant had consulted an attorney for purposes of this case, the genuine ambiguity was whether he wished to CT Page 1465 speak to the police in the presence or the absence of that attorney. His "maybe" remark left that question open. A clarification attempt in these circumstances is not "interrogation."
Rovella's comment concerning the blood found in the car was made after
Grant had made the statements at issue in the first car ride. Even if that comment could be construed as interrogation" — which, as discussed below, it was not — it could not have prompted the statements which preceded it. Those statements were purely voluntary and not made in response to interrogation of any kind. They cannot be suppressed.
(3) The Barracks.
Upon arrival at the Bethany Barracks, Grant was informed of hisMiranda rights for a second time, this time by means of a written notice, which he knowingly initialed. He then invoked his right to counsel.
As described above, Rovella asked Grant if he wished to be interviewed without the presence of an attorney. Grant replied that he wanted to talk to the officers but first wanted to speak to an attorney. Rovella asked if he had an attorney in mind, and Grant stated that his girlfriend would find the one he used last time.
This was an express invocation of the right to counsel. Following this invocation, Grant was not subject to further interrogation by the authorities unless he initiated further communication with the police.Edwards v. Arizona, supra, 451 U.S. at 484-85.
Grant's statements at the Barracks can be divided into two different chronological categories: the initial statements, given in the absence of interrogation; and the subsequent statements, given in response to interrogation. These categories must be considered separately.
(a) Pre-interrogation statements.
Grant's initial statements at the Barracks, given in the absence of interrogation, are admissible. Edwards sets forth "a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers." Oregon v. Bradshaw, 462 U.S. 1039, 1044 (1983). SeeMcNeil v. Wisconsin, 501 U.S. 171, 177 (1991). A defendant who "is properly and fully aware of his right to counsel . . . may freely choose to speak without the presence of counsel." State v. Piorkowski,243 Conn. 205, 217, 700 A.2d 1146 (1997). "[A] blanket prohibition against the taking of voluntary statements . . . would transform the CT Page 1466Miranda safeguards into wholly irrational obstacles to legitimate police activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." Michigan v. Mosley,423 U.S. 96, 102 (1975). Even though Grant had invoked his right to counsel, the police were not obliged to affirmatively prevent him from making voluntary statements. The proscription of Edwards goes only to "interrogation."
Grant's initial statements were given in the absence of interrogation. Grant, as mentioned, argues that the Miranda warnings and Rovella's statement concerning the blood found in the car constitute "interrogation." He further contends that the police should have placed him in a cell rather than leave him in the booking room, where he might be more inclined to talk. These arguments are unpersuasive.
Grant's argument as to the Miranda warnings has already been considered. The issue of Rovella's comment that blood had been found in the car presents a somewhat closer question. For constitutional purposes, "interrogation" means "either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01
(1980). The term "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301. (Footnotes omitted.) See State v. Rosado,218 Conn. 239, 253, 588 A.2d 1066 (1991). "In deciding whether particular police conduct is interrogation, we must remember the purpose behind . . . Miranda and Edwards: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." Arizona v. Mauro, 481 U.S. 520,529-30 (1987). These cases prevent "compelling influences, psychological ploys, [and] direct questioning." Id. at 529.
Rovella's comment, during the first car ride, that blood had been found in the car, was not "interrogation" for purposes of Miranda and Edwards. That comment came in response to Grant's statement that he had no idea how his fingerprints could possibly have been in the car. Rovella's succinct response fell short of being a "compelling influence," a "psychological ploy," or a prohibited use of "the coercive nature of confinement to extract confessions." It was not an interrogation. In any event, there is no evidence to support Grant's argument that Rovella's single comment concerning the blood, made during the first car ride, caused the steady stream of voluntary statements that subsequently occurred in the booking office. The evidence simply shows that Grant wanted to talk and that the police allowed him to do so.
Grant's final argument that the police should have placed him in a cell CT Page 1467 rather than leaving him in the booking room, where he was more likely to talk, requires little response. The constitution demands no such thing. If the police in the booking area are not behaving coercively. (and the police here were not), it is pure speculation to suppose that a cell would have been less, rather than more, coercive to a newly confined person. Many suspects might find a detention cell to be more terrifying than a seat at a desk in the booking area. In any event, the Constitution does not micromanage the placement of detainees in police stations. It regulates "interrogations." Up to the point considered so far, there was no interrogation here.
(b) Statements made during interrogation.
Grant's subsequent statements, given in response to what the State concedes was "interrogation" (i.e. Grant's statements following Rovella's question as to whether he wanted to talk about the matter), are more problematic. The question is whether this conceded interrogation was "initiated" by Grant.
In a linguistic sense, the barracks interrogation was initiated by Grant. Grant had been talking freely, without questioning, and when Rovella asked if he wanted to talk about the matter, Grant replied that he didn't mind talking about it. The necessary constitutional analysis is not, however, quite that easy. The Supreme Court has explained that, "even if a conversation taking place after the accused has `expressed his desire to deal with the police only through counsel,' is initiated by the accused, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." Oregon v. Bradshaw, 462 U.S. 1039, 1044
(1983) (plurality opinion of Rehnquist, J.).
Although the question is a close one, the court cannot find that the prosecution has met its burden of proof of showing a waiver here. While it is true that Grant was a talkative fellow, it is also true that (1) he had twice expressed an interest in having an attorney present during questioning, the first time equivocally and the second time unequivocally; (2) he was actually represented by a specific attorney inthis very case; and (3) the police were aware of this representation, through Attorney St. John's 1997 voicemail message, through the summary of that message in the 1997 search warrant, and through Grant's statements in their presence on June 24, 1999. Given these circumstances, Grant's affirmative response to Rovella's simple question as to whether he wanted to talk about the matter, while arguably a waiver, is simply too slender a reed to support the prosecution's affirmative burden of proof under Bradshaw. After a full consideration of all of the evidence, the court finds that the prosecution has not met its CT Page 1468 burden of proof and that the motion to suppress Grant's statements given in response to Rovella's interrogation must be granted.
(4) The Second Car Ride.
Grant's single statement in the second car ride — "I don't remember what happened, but you guys probably don't believe me" — was an entirely voluntary statement, not given in response to any form of interrogation. Miranda and Edwards do not impose "a blanket prohibition against the taking of voluntary statements." Michigan v. Mosley, supra,423 U.S. at 102. If a suspect in custody, not being subjected to interrogation, wishes to blurt something out, nothing in the constitution prevents the police from hearing the statement and testifying about it later. The motion to suppress this statement must be denied.
(5) Other Arguments.
Grant makes two other legal arguments. Each can be considered swiftly.
Grant first contends that his statements (including the statements not already suppressed) must be suppressed under the state constitutional rule of State v. Stoddard, 206 Conn. 157, 537 A.2d 446 (1988). Stoddard
is not in point. That case "requires only that the police act as a neutral conduit for the pertinent and timely requests by counsel to meet with a custodial suspect." Id. at 167. There was no Stoddard violation here. The evidence shows that Inspector Fearon gave Grant's wife, or girlfriend, his card for the very purpose of enabling "the lawyer" to contact him. As soon as Attorney St. John called Fearon, when Grant was in the barracks, Grant was immediately informed of the call, and the interrogation was stopped. Stoddard does not require a further suppression order here.
Grant next relies on a New York right-to-counsel case, People v. West,615 N.E.2d 968 (N.Y. 1993). That decision, even if it were considered authoritative in Connecticut, does not demand a result different from that already reached here. West holds that, "indelible attachment of the right to counsel means that a suspect cannot be questioned about the matter without counsel." Id. at 971. (Emphasis added.) Applying principles of Federal constitutional law, the court has already determined that Grant's statements given in response to police interrogation must be suppressed. The statements not suppressed were not given in response to police questioning in the first place. West demands no different result.
IV. CONCLUSION.
The Motion To Suppress Statements is granted as to the statements Grant CT Page 1469 made in the Bethany Barracks during the period of interrogation described above. It is otherwise denied.
Jon C. Blue Judge of the Superior Court